# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

—————————————

## No. 201600285

—————————————

## UNITED STATES OF AMERICA
Appellee

v.

## SEAN L. MOTSENBOCKER
Operation Specialist Second Class (E-5), U.S. Navy
Appellant

—————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Heather D. Partridge, JAGC, USN.
Convening Authority: Commander, Navy Region Mid-Atlantic, Norfolk, VA.
Staff Judge Advocate's Recommendation: Commander Andrew R. House, JAGC, USN.
For Appellant: Lieutenant Commander Donald R. Ostrom, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC; Lieutenant Robert J. Miller, JAGC, USN.

—————————————

Decided 10 August 2017

—————————————

Before CAMPBELL,[1] FULTON, and HUTCHISON, *Appellate Military Judges*

—————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

—————————————

[1] Former Senior Judge Campbell took final action in this case prior to detaching from the court.

HUTCHISON, Senior Judge:

Officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of abusive sexual contact and one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. The members sentenced the appellant to six months' confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed.

The appellant asserts four assignments of error (AOEs), the first three of which are related:[2] (1) the government violated the appellant's right to fair notice by introducing an uncharged theory of liability under Article 120(b)(3)(A) in closing arguments; (2) the military judge erred by instructing the members on the definition of consent; (3) the trial counsel (TC) committed prosecutorial misconduct by arguing an uncharged theory of liability under Article 120(b)(2)(A) in closing argument; and (4) the TC committed prosecutorial misconduct by making arguments contrary to the military judge's preliminary instruction, calling the appellant a liar, bolstering the victim's testimony, mischaracterizing evidence, inserting personal opinion during argument, and shifting the burden to the defense. Having carefully considered the record of trial, the parties' submissions, and oral argument on all four AOEs, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On the evening of Friday, 5 September 2014, the appellant threw a party at his residence attended by approximately fifteen to twenty individuals including Petty Officer Third Class (PO3) AD, who was invited by a mutual friend. Immediately upon arriving, PO3 AD began drinking—at least one cocktail and four to six shots of liquor throughout the course of the night—in order to loosen up. PO3 AD testified at trial that within two hours she blacked out, though she recalled a number of subsequent events from the night, including being questioned by the police and being sexually assaulted.[3]

At trial, the testimony of other party-goers and the appellant helped fill in events that occurred between PO3 AD's arrival and the sexual assault. PO3 AD spent the greater part of the evening with PO3 PC playing beer pong,

---

[2] We have renumbered the AOEs.

[3] Record at 390-98.

drinking, and making out with him for a short period of time in the kitchen. There was little to no interaction between PO3 AD and the appellant—though the appellant testified to witnessing PO3 AD's interactions with PO3 PC—until the appellant was informed later that night that someone was sick in the bathroom.

When the appellant entered the bathroom, he discovered PO3 AD on the floor grasping the toilet. PO3 AD testified that she remembered vomiting into a toilet, and then stumbling into an adjacent bedroom and lying down on the bed. The appellant testified that he assisted PO3 AD off the bathroom floor and into his bedroom. In both versions of the story, PO3 AD was then left alone in the appellant's bedroom. The appellant testified that later that night, after using the restroom, he noticed PO3 AD had vomited a small amount in the bed, and that he cleaned it up with a towel from the bathroom before returning to the party.

Around midnight, the police arrived due to a noise complaint. The police found PO3 AD asleep in the bedroom and woke her for questioning. PO3 AD only recalled the police asking for her ID, which she indicated was in her purse, but did not recall any further questions or interaction with the police. The appellant testified at trial that the police told him that PO3 AD "shouldn't go home" and "that she shouldn't drive tonight."[4] Shortly after the police arrived, the party ended.

Later that night, after all the other guests had departed, the appellant entered the bedroom where PO3 AD was sleeping. At trial, the appellant's and PO3 AD's recollections of what transpired next differed greatly. PO3 AD testified that as she was lying in the "fetal position" on the bed, the appellant removed his bow tie and shirt, climbed into bed with her, pressed the front side of his body against her back side—in a spooning-type fashion—and began to rub her back with his hands.[5] PO3 AD testified that she was "terrified" to find herself in such a "strange situation" and did not have the strength to get up and leave or to "fight off anyone"; she believed that "if [she] just laid there that maybe he would just leave."[6]

---

[4] *Id.* at 683. The appellant also recounted this statement from the police during his NCIS interrogation, but only stated the police instructed him "that she shouldn't leave" without reference to driving. Prosecution Exhibit (PE) 4; Appellate Exhibit (AE) XXV at 14.

[5] Record at 396.

[6] *Id.* at 395.

However, PO3 AD testified that the appellant did not just leave. After rubbing her back, PO3 AD testified that the appellant tried to "make out with [her],"[7] explaining:

> I just kept moving back over onto my side [of the bed] thinking that maybe if I wasn't engaging in what was happening that he would understand that I didn't want to do anything, but this went back and forth maybe about three or four times . . . and then finally, I guess because he [was] sick of it he rolled me over one final time and pinned me down with his arm sort of like on my shoulder area and then with his leg on one of my legs, so I was unable to roll over again, and that is when I started to say, "No" and "Off."[8]

PO3 AD testified that the appellant responded to her pleas of "no" and "off" by whispering in her ear, "I'm sorry, you're just too tempting," before subsequently rubbing her breasts with his hands and penetrating her vagina with his fingers.[9] She further testified that although she was unable to physically resist the appellant—she "couldn't move"; "was pinned down"; and "completely terrified"—she repeatedly told the appellant "no" and to get "off" of her.[10] PO3 AD's testimony that she did not consent to the appellant's actions was corroborated by numerous contemporaneous text messages she sent to her friend, PO3 ZA, during the assault. In these text messages she relays to PO3 ZA that she is being assaulted but is "too drunk" to get away from her attacker.[11]

Conversely, the appellant testified that when he entered the room, PO3 AD was awake in the bed on her phone, and that she said "yes" when he explicitly asked if he could lie down in the bed with her.[12] He stated that after lying in bed for a short time, he began to "rub PO3 AD's back in a comforting manner."[13] After a few minutes, he began to rub her hip, caressing her from her waist down to her thigh. The appellant testified that PO3 AD was positively responding to everything he was doing, evidenced by the movement

---

[7] *Id.* at 397.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] PE 3 at 3.

[12] Record at 684.

[13] *Id.* at 685.

of her body so that the two were "kind of spooning."[14] The appellant then testified that PO3 AD rolled onto her back and the two began kissing for approximately ten minutes. Believing PO3 AD was consenting, the appellant began to rub PO3 AD's breasts with his hands. He testified that because of the manner in which she continued to respond—the noises she was making (though no verbal confirmations of affirmative consent) and her body movements—he proceeded to digitally penetrate PO3 AD's vagina, and then perform oral sex on her.[15] At trial, the appellant noted that he witnessed PO3 AD on her phone while he was performing oral sex on her, and thought it was "peculiar" and that "maybe [he was] doing something wrong."[16] However, the appellant testified that the first time he heard PO3 AD say "no" to what he was doing was when he stood up to have sex with her.[17] He stated that once she said no, he stopped all action and went to sleep. Notably, PO3 AD did not testify to receiving oral sex from the appellant and the appellant did not include this detail in his interview with Naval Criminal Investigative Service (NCIS) six weeks after the incident.[18] Rather, the first time the appellant indicated he performed oral sex on PO3 AD was at trial.

Early the next morning, PO3 AD awoke with the appellant asleep by her side in the bed. She quickly gathered her belongings and left the apartment. In addition to discussing the assault later that day with friends and family, she formally reported the sexual assault to her chain of command on Monday, 8 September 2014.

## II. DISCUSSION

### A. Instructions, argument, and notice

The appellant was charged with one specification of violating Article 120(b)(1)(B), UCMJ—sexual assault by causing bodily harm—and two specifications of violating Article 120(d)—abusive sexual contact by causing bodily harm.[19] Article 120(b)(1)(B), UCMJ, states "any person . . .who . . . (1) commits a sexual act upon another person by . . . (B) causing bodily harm to

---

[14] *Id.* at 685-86.

[15] *Id.* at 688-89.

[16] *Id.* at 690.

[17] *Id.* at 691, 722.

[18] *See* PE 3; AE XXV.

[19] Charge Sheet.

that other person" is guilty of sexual assault.[20] Bodily harm is defined as "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact."[21] Therefore, in order to convict the appellant of the offenses charged, the government was required to prove beyond a reasonable doubt that PO3 AD did not consent to the sexual act or sexual contacts.

With this charging scheme as a backdrop, the appellant contends that the "government violated [his] right to fair notice of what he was required to defend against" since the government charged violations alleging bodily harm—that PO3 AD did not consent—but argued "an uncharged violation" that she was incapable of consenting.[22] Likewise, the appellant argues that the military judge erred in instructing the members regarding incapacity due to intoxication using a standard established in *United States v. Pease*, 75 M.J. 180 (C.A.A.F. 2016). Finally, the appellant argues that the TC committed prosecutorial misconduct by arguing to the members an uncharged theory of liability—that PO3 AD was incapable of consenting due to her impairment from alcohol.

In considering these related AOEs, we acknowledge a common theme advocated by the appellant—that the government charged him with one crime, but convicted him of another. We disagree.

### 1. Instructions

"'Whether a panel was properly instructed is a question of law' we review *de novo*." *United States v. Mott*, 72 M.J. 319, 325 (C.A.A.F. 2013) (quoting *United States v. Garner*, 71 M.J. 430, 432 (C.A.A.F. 2013)). "When there is no objection to an instruction at trial, we review for plain error." *United States v.*

---

[20] MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 45.a.(b). Throughout the opinion we refer to the appellant's conviction for sexual assault under Article 120(b)(1)(B), UCMJ. Our analysis of Article 120(b)(1)(B), however, applies equally to the appellant's convictions for abusive sexual contact under Article 120(d), UCMJ, which states: "Any person subject to this chapter who commits or causes sexual contact upon or by another person, if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty of abusive sexual contact and shall be punished as a court-martial may direct." Consequently, since the appellant's convictions for abusive sexual contact each alleged a "bodily harm" theory of liability, we incorporate the elements of Article 120(b)(1)(B), UCMJ: (1) that the appellant committed a sexual contact upon PO3 AD; and (2) that he did so by causing bodily harm to PO3 AD.

[21] MCM, Part IV, ¶ 45.a.(g)(3).

[22] Appellant's Brief of 25 Jan 2017 at 11.

*Payne*, 73 M.J. 19, 22-23 (C.A.A.F. 2014) (citing *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (additional citation omitted). Under plain error analysis, the appellant must demonstrate "that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *Id.* at 23-24 (citations and internal quotation marks omitted). "[F]ailure to establish any one of the prongs is fatal to a plain error claim." *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006). Finally, the plain error doctrine "is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Fisher*, 21 M.J. 327, 328-29 (C.M.A. 1986) (citation and internal quotation marks omitted).

Moreover, "[t]he military judge has an independent duty to determine and deliver appropriate instructions." *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citing *United States v. Westmoreland*, 31 M.J. 160, 163-64 (C.M.A. 1990)). In this regard, the military judge bears the primary responsibility for ensuring the members are properly instructed on the elements of the offenses raised by the evidence, "'as well as potential defenses and other questions of law.'" *Id.* (quoting *Westmoreland*, 31 M.J. at 164). Indeed, the military judge must tailor instructions in order to address only matters at issue in each trial and "provide 'lucid guideposts' to enable the court members to apply the law to the facts." *United States v. Newlan*, No. 201400409, 2016 CCA LEXIS 540, at *18 (N-M Ct. Crim. App. 13 Sep 2016) (quoting *United States v. Buchana*, 41 C.M.R. 394, 396-97 (C.M.A. 1970)).

In a case involving a defense theory that the victim consented to the sexual acts or contacts, the instructions should be structured so as to clearly distinguish between the government's requirement to prove the victim *did not consent* and the potential for reasonable doubt based on evidence that the victim did consent. We therefore consider whether the instructions did this, or whether their structure allowed the members to convict the appellant "on the basis of a theory of liability not presented to the trier of fact"—that PO3 AD had a legal inability to consent because of her impairment from alcohol. *Ober*, 66 M.J. at 405 (citing *Chiarella v. United States,* 445 U.S. 222, 236-37 (1980)).

Turning now to the instructions at issue, the military judge instructed the members, prior to argument on findings, regarding consent:

> [T]he government also has the burden to prove beyond a reasonable doubt that [PO3 AD] did not consent to th[e] physical act[s].
>
> "Consent" is a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of

verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue shall not constitute consent.

Lack of consent may be inferred based on the circumstances. All the surrounding circumstances are to be considered in determining whether a person gave consent or whether a person did not resist or ceased to resist only because of another person's actions. An incompetent person cannot consent to a sexual contact, and a person cannot consent to a sexual contact while under threat or in fear.[23]

Immediately following the standard instruction on consent, the military judge included the following instructions, based on our superior court's holding in *Pease*:

A person is incapable of consenting if that person does not possess the mental ability to appreciate the nature of the conduct or does not possess the physical or mental ability to make or communicate a decision regarding such conduct.

A totality of circumstances standard applies when assessing whether a person was incapable of consenting. In deciding whether a person was incapable of consenting, many factors should be considered and weighed, including but not limited to that person's decision-making ability, ability to foresee and understand consequences, awareness of the identity of the person with whom they are engaging in the conduct, level of consciousness, amount of alcohol ingested, tolerance to the ingestion of alcohol, and/or their ability to walk, talk, and engage in other purposeful physical movements.[24]

The government's overarching theme of the case was that PO3 AD did not consent to any sexual conduct with the appellant. Indeed, PO3 AD testified that after the appellant climbed into bed, "pressed up against [her]"[25] and started rubbing her back, she tried to move away until the appellant "rolled [her] over . . . and pinned [her] down with his arm . . . his leg on one of [her]

---

[23] Record at 756.

[24] *Id.* at 757.

[25] *Id.* at 396.

legs, so [she] was unable to roll over."[26] PO3 AD further testified that she told the appellant "no" and "off" multiple times, but that he simply responded that she "was too tempting."[27] When asked specifically by government counsel, whether she had a consensual sexual encounter, PO3 AD responded, "I definitely did not."[28]

Moreover, PO3 AD was communicating via text message with her friend PO3 ZA, *during* the course of her encounter with the appellant. She texted PO3 ZA that "he won't take . . . No",[29] "Rape",[30] "Help",[31] "He won't quit",[32] and "Being forced."[33] PO3 AD testified that in those texts she was referring to the appellant and texting PO3 ZA for help. On cross-examination, the civilian defense counsel questioned PO3 AD about her ability to send text messages and PO3 AD confirmed that she "knew what was going on" and that she knew she was "being assaulted."[34] PO3 AD stated she was able "to understand", "comprehend[,]" and "communicate" during the sexual encounter with the appellant.[35]

The issue in *Pease*—an Article 120(b)(3)(A), UCMJ, case—involved a victim who was incapable of consenting due to intoxication. The appellant argues, therefore, that inclusion of an instruction regarding capacity to consent—fashioned from *Pease*—"allowed members to find that [PO3 AD] was, at the same time, both capable of withholding consent and incapable of

---

[26] *Id.* at 397.

[27] *Id.*

[28] *Id.* at 412.

[29] PE 3 at 2.

[30] *Id.*

[31] *Id.* at 3.

[32] *Id.* at 4.

[33] *Id.* at 6.

[34] Record at 450.

[35] *Id.* at 452-53. We note the distinction between statements such as these which indicate that PO3 AD was able to "appreciate the nature of the conduct" and that she had "the mental and physical ability to make [or] to communicate a decision regarding that conduct," *Pease*, 75 M.J. at 185, and the testimony of PO3 AD indicating she was too intoxicated to get away, or "fight off" the appellant, Record at 395. The former establish competency to consent, while the latter simply reflect that PO3 AD did not have the wherewithal to fend off the appellant—a fact the government need not establish to prove the sexual conduct was nonconsensual.

providing consent."[36] The appellant contends this standard was confusing and "chang[ed] the nature of the charged conduct."[37]

As a threshold matter, we do not accept the appellant's assertion that the instructions presented a confusing dichotomy where PO3 AD could simultaneously be capable of declining participation, but incapable of consenting. Indeed, a person incapable of providing *consent* may still, nonetheless, make or communicate their declination to participate in sexual conduct. In *Pease*, our definition of "incapable of consenting" identified three groups of individuals who are incapable of consenting: (1) those who do not possess the mental ability to appreciate the *nature of the conduct*; (2) those who do not possess the physical ability to make or communicate a decision regarding such conduct; and (3) those who do not possess the mental ability to make or communicate a decision regarding such conduct. *United States v. Pease*, 74 M.J. 763, 770 (N-M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016). Therefore, a person that does not have the mental ability to appreciate the nature of any particular conduct may still be able to offer resistance to whatever bodily harm the person did appreciate at the time. Similarly, a person that does not possess the physical ability to make or communicate a decision, may nevertheless be able to articulate, in some fashion, a declination to participate in sexual conduct. And, finally, a person that does not possess the mental ability to make or communicate a decision may still manifest a physical unwillingness to engage in the sexual conduct. *See United States v. Long*, 73 M.J. 541, 546 (A. Ct. Crim. App. 2014) (explaining the distinction between having the physical and mental ability to consent to sexual conduct, with the physical and mental ability to manifest a lack of consent).

Having concluded the language of the military judge's *Pease* instruction was not confusing or contradictory, we next examine its inclusion here in a bodily harm case. While we agree with the appellant that there was insufficient evidence to find that PO3 AD was incapable of consenting in violation of Article 120(b)(3)(A), UCMJ, we also recognize that the appellant was not charged under that article. Rather, the evidence in this *bodily harm* case raised the issue of consent; the government was required to prove lack of consent beyond a reasonable doubt; the appellant presented evidence that PO3 AD did consent, and the members were required to decide whether or not she did. Therefore, the military judge was required to instruct the jury on the element of consent.

---

[36] Appellant's Brief at 12.

[37] *Id.* at 21.

The statutory definition of consent is "a freely given agreement to the conduct at issue by a *competent* person."[38] Therefore, "[a] full definition of consent includes [the] definition of competence to consent." *Long*, 73 M.J. at 545 (citations omitted).[39] Although the government was not required to prove that PO3 AD was competent—as discussed *supra*, incompetent people can decline to participate in sexual conduct—competence became relevant here after *the appellant* presented evidence that PO3 AD consented *and had the capacity to consent*. As a result, we find no plain error with the military judge's decision to instruct the members regarding what constitutes a "competent person" for purposes of defining consent.

In *Pease*, our superior court (CAAF) adopted our definition of "competent person" as "a person who possesses the physical and mental ability to consent," 75 M.J. at 185, and noted that:

> This definition properly incorporates three statutory requirements: (1) the person must be "competent" to consent, Article 120(g)(8)(A), UCMJ; (2) the person cannot consent if she is asleep or unconscious, Article 120(g)(8)(B), UCMJ; and (3) the person is incapable of consenting if she is impaired by a drug, intoxicant, or other substance, or if she is suffering from a mental disease or defect or physical disability, Article 120(b)(3)(A), (B), UCMJ.

*Id.*

Recognizing that the CAAF found this court's definition of a "competent person" to have accurately incorporated the concept that a person incapable of consenting due to impairment by an intoxicant was not competent, we find no error, and certainly no plain error,[40] in the military judge's decision to use the *Pease* instruction to further explain to the members what constitutes a competent person.[41]

---

[38] MCM, Part IV, ¶ 45.a.(g)(8)(A).

[39] In *Long*, the military judged instructed the members that "[c]onsent means words or overt acts indicating a freely given agreement to the sexual conduct by a competent person." 73 M.J. at 543.

[40] *See United States v. Olano*, 507 U.S. 725, 734 (1993) (courts of appeals "cannot correct an error [under the plain error doctrine] unless the error is clear under current law"); *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) (no plain error where no "binding precedent" at the time of trial or appeal established error).

[41] *See Newlan*, 2016 CCA LEXIS 540, at *19-20 (a person who is "incapable of consenting" is "incompetent" under Article 120, UCMJ).

Importantly, the military judge's instructions neither transformed the charged specifications into Article 120(b)(3)(A) specifications, nor alleviated the government's affirmative responsibility to prove beyond a reasonable doubt that PO3 AD did not, in fact, consent. The military judge instructed the members *both before and after* issuing the *Pease* instruction that the government had "the burden to prove beyond a reasonable doubt that [PO3 AD] did not consent[.]"[42] "Absent evidence to the contrary,[we] may presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citing *United States v. Loving*, 41 M.J. 213, 235 (1994)) (additional citation omitted). "Because there is no evidence suggesting that the court members did not follow the instructions . . . given them by the military judge in this case, it must therefore be presumed . . . that the court members had reached a proper verdict in which the appellant was only found guilty of" the crimes for which he was charged. *United States v. Ricketts*, 50 C.M.R. 567, 570-71 (C.M.A. 1975).

*2. Improper argument*

Because we find no error in the military judge's instructions, we also find that government counsel did not commit prosecutorial misconduct by arguing, solely *in rebuttal*, that PO3 AD was incapable of consenting. The fact that government counsel's incapacity argument was confined to a single page out of 32 pages of transcribed rebuttal further demonstrates that the government proved the specifications as charged and that the members did not convict the appellant of an uncharged violation of Article 120(b)(3)(A).

*3. Notice*

Finally, we find no merit in the appellant's argument that he was not on notice. Simply put, the appellant was convicted of the offenses for which he was charged. As we noted *supra*, the government had no requirement to prove that PO3 AD was competent; only that she did not, in fact, consent. Clearly, evidence tending to show PO3 AD's level of impairment was relevant to establish a lack of consent. But it was the civilian defense counsel's cross-examination of PO3 AD that first introduced the issue of competence, and established that she was able to understand and appreciate what was occurring during her encounter with the appellant. As such, "[a]ny argument that [the appellant] was somehow not on notice of the relevance of competence to consent falls on deaf ears." *Long*, 73 M.J. at 547.

---

[42] Record at 756. *See also id.* at 757 (". . . you must be convinced beyond a reasonable doubt that [PO3 AD] did not consent to the physical acts").

In reaching our decision, we are mindful of our superior court's decision in *United States v. Riggins*, 75 M.J. 78 (C.A.A.F. 2016). In *Riggins*, the CAAF held that assault consummated by battery, in violation of Article 128, UCMJ, was not a lesser included offense of Article 120(b)(1)(A), UCMJ—sexual assault by threatening or placing another person in fear—because lack of consent was an element of assault consummated by battery, but not of the sexual assault offense as charged. The CAAF overturned Riggins' convictions, concluding that "the fact that the [g]overnment was required to prove a set of facts that resulted in [the victim's] *legal inability to consent*"—that she was placed in fear—"was not the equivalent of the [g]overnment bearing the affirmative responsibility to prove that [the victim] *did not, in fact, consent*." *Riggins*, 75 M.J. at 84 (emphasis in original) (footnote omitted). The CAAF further found prejudice since the appellant was not on notice that he needed to defend against the issue of *lack of consent*. *Id.* at 85 (emphasis added).

Applying an overly strict reading of *Riggins* might lead one to conclude that it controls here; that the military judge's instructions and TC's arguments permitted the members to convict the appellant of a crime of which he had no notice, simply because the government had proven a set of facts resulting in PO3 AD's *legal inability to consent*—that she was incapable of consenting. However, there are important distinctions between *Riggins* and the instant case. Riggins was convicted, under an erroneous lesser included offense theory, of a crime with which he was not charged. Here, the appellant was convicted as charged. The appellant was not convicted of a lesser included offense or by exceptions and substitutions that modified the charges in any way. Rather, the government charged, presented evidence, argued, and proved beyond a reasonable doubt that PO3 AD did not, in fact, consent to the sexual conduct. Therefore, the appellant was on notice; the charges he was convicted of were specifically listed on the charge sheet.

The appellant's contention is that the military judge's instructions and TC's arguments impermissibly imported Article 120(b)(3)(A) into the case and permitted the members to convict him of that offense—of which he had no notice—vice the one charged. In that regard, the CAAF's recent discussion of *Riggins* in *United States v. Oliver*, 76 M.J. 271 (C.A.A.F. 2017), is instructive and further demonstrates *Riggins'* inapplicability under the circumstances of this case. In *Oliver,* the appellant was convicted of wrongful sexual contact, a violation of Article 120(m), UCMJ (2006), as a lesser included offense of Article 120(h), UCMJ (2006)—abusive sexual contact by threatening or placing another in fear. Oliver argued that his case was like *Riggins*; the crime he was convicted of required lack of consent as an element, while the greater offense—abusive sexual contact by threatening or placing another

person in fear—did not. However, because Oliver raised the affirmative defense of consent available at the time,[43] the government had to prove lack of consent beyond a reasonable doubt in order to obtain a conviction. The government addressed the issue of consent in trial and during closing arguments, and Oliver's trial defense strategy focused on the victim's consent. Consequently, the CAAF concluded, under a plain error analysis, that "the manner in which the case was contested diminishes any argument that Appellant was not on notice as to what he had to defend against." *Oliver*, 76 M.J. at 275.

So too, here. The appellant's trial strategy focused on PO3 AD's consent, or alternatively, his mistake of fact as to consent. The civilian defense counsel cross-examined PO3 AD concerning her *capacity to consent*, in order to establish his theme that PO3 AD, although drunk, consented to the sexual conduct, and then, regretting her decision, later alleged the encounter was nonconsensual. As in *Oliver*, the appellant cannot now argue that he was not on notice that he had to defend against the victim's incapacity to consent, when he raised the issue of PO3 AD's competency and actually did defend against that theory. *See also Tunstall*, 72 M.J. at 197 (no prejudice where accused actually defended against both theories in the terminal element of Article 134, UCMJ).

*4. Prejudice*

Although we find error in neither the military judge's instructions nor the TC's rebuttal argument regarding PO3 AD's capacity to consent, we conclude that even if we did find any error, it would be harmless. "If instructional error is found when there are constitutional dimensions at play, the appellant's claims must be tested for prejudice under the standard of harmless beyond a reasonable doubt."[44] *United States v. Hills*, 75 M.J. 350, 357-58 (C.A.A.F. 2016) (citations and internal quotation marks omitted). "The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence." *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006) (citations and internal quotation marks omitted). In other words, to find that the error did not contribute to the conviction is to

---

[43] Article 120(t)(16), UCMJ (as amended by the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 552, 119 Stat. at 3263) required the defendant to first prove the affirmative defense beyond a preponderance of the evidence before then requiring the government to prove lack of consent beyond a reasonable doubt.

[44] We assume, without deciding, that any error here is constitutional error.

find the "error unimportant in relation to everything else the [members] considered on the issue in question, as revealed in the record." *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) (citation and internal quotation marks omitted).

We, therefore, conclude that the inclusion of the *Pease* instruction and the TC's brief comments during rebuttal were unimportant in relation to the government's affirmative responsibility to prove beyond a reasonable doubt that PO3 AD did not consent. Indeed, the evidence presented by the government regarding PO3 AD's lack of consent could not have been starker. She testified consistently regarding her encounter with the appellant, recounting for the members that she repeatedly told the appellant "no" and "off", tried to roll over away from him, but ultimately was too intoxicated to leave. The government presented PO3 AD's text messages to PO3 ZA, which provided a rare contemporaneous accounting of the attack, and a report from a Sexual Assault Nurse Examiner, conducted just days after the assault, in which PO3 AD relayed details consistent with her in-court testimony. Indeed, evidence of PO3 AD's level of intoxication, while not required to prove she was incapable of consenting, was certainly probative regarding her desire to engage in sexual relations with a man she hardly knew after she had just woken up in a strange bed.

In contrast, the appellant acknowledged during his testimony that he did not know PO3 AD, that he had only met her when she arrived at the party, and that he had little interaction with her throughout the night. The appellant testified to observing PO3 AD drinking and vomiting. Further, the appellant's testimony concerning his encounter with PO3 AD was also devoid of any of the hallmarks of consent: he does not mention what, if anything, PO3 AD said to him during the encounter and does not indicate that she responded to his advances by touching him in any way. During his testimony at trial, the appellant added details to the encounter that he did not include—but logically would have included—during his interview with NCIS. In short, PO3 AD's consistent, compelling testimony along with the corroborating evidence presented by the government stood in stark relief to the appellant's implausible, self-serving explanation of the night's events. Consequently, we are convinced beyond a reasonable doubt that any error related to the military judge's instructions or the TC's argument did not contribute to the verdict.

## B. Prosecutorial misconduct

### 1. Legal error

The appellant alleges that the TC committed prosecutorial misconduct during closing arguments by (1) improperly introducing Navy sexual assault and bystander intervention training; (2) repeatedly calling the appellant a

liar; (3) improper bolstering of the victim's testimony; (4) mischaracterizing evidence; (5) inserting TC's opinion; and (6) shifting the burden of proof by commenting on the defense.[45]

"Prosecutorial misconduct occurs when trial counsel overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *United States v. Hornback*, 73 M.J. 155, 159-60 (C.A.A.F. 2014) (citations and internal quotation marks omitted). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citing *United States v. Young*, 470 U.S. 1, 7-11 (1985)). Prosecutorial misconduct in the form of improper argument is a question of law we review *de novo*. *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (citing *United States v. Marsh*, 70 M.J. 101, 106 (C.A.A.F. 2011)). "The legal test for improper argument is [(1)] whether the argument was erroneous and [(2)] whether it materially prejudiced the substantial rights of the accused." *Id.* (citation and internal quotation marks omitted). In application, "the argument by a trial counsel must be viewed within the context of the entire court-martial," and as a result, "our inquiry should not be on words in isolation, but on the argument as 'viewed in context.'" *United States v. Baer*, 53 M.J. 235, 238 (C.A.A.F. 2000) (quoting *Young*, 470 U.S. at 16) (additional citation omitted). This inquiry, however, remains objective, "requiring no showing of malicious intent on behalf of the prosecutor" and unyielding to inexperience or ill preparation. *Hornback*, 73 M.J. at 160.

When a proper objection to a comment is made at trial, the issue is preserved and we review for prejudicial error. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citing Art. 59, UCMJ). Until very recently, when the trial defense counsel failed to contemporaneously object, the issue was forfeited and we reviewed for plain error. *United States v. Pabelona*, 76 M.J. 9, 11 (C.A.A.F. 2017) (citing *United States v. Rodriguez*, 60 M.J. 87, 88 (C.A.A.F. 2004)). To succeed under that plain error analysis, the appellant had to demonstrate that: "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the

---

[45] Appellant's Brief at 21.

accused." *Tunstall*, 72 M.J. at 193-94 (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)).

However, a recent decision by our superior court has called into question whether appellate courts may still conduct plain error review of improper argument when the issue is not preserved by an objection at trial. In *United States v. Ahern*, the CAAF analyzed the difference between "forfeiture" and "waiver" recognizing that courts "review[] forfeited issues for plain error" but cannot "review waived issues because a valid waiver leaves no error to correct on appeal." 76 M.J. 194, 197 (C.A.A.F. 2017) (citations and internal quotation marks omitted). "Forfeiture is the failure to make the timely assertion of right," while "waiver is the intentional relinquishment or abandonment of a known right[.]" *Id.* (citations omitted). The right at issue in *Ahern* was contained in MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 304, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) and specifically provided that failure to object constitutes waiver.[46] The CAAF held that the absence of any mention of "plain error review"—when those words appear elsewhere in the MANUAL FOR COURTS-MARTIAL[47]—indicates an unambiguous waiver, leaving the court nothing to review on appeal. *Id.*

The government avers that *Ahern* applies to RULE FOR COURTS-MARTIAL (R.C.M.) 919(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), which states, "[f]ailure to object to improper argument before the military judge begins to instruct the members on findings shall constitute waiver of the objection." Analyzing R.C.M. 919(c), in light of *Ahern*, our sister court came to the same conclusion. Finding that the "plain language of the rule, and our superior court's decision in *Ahern*" compelled their result, the Army Court of Criminal Appeals held that the failure to object to government counsel's closing argument constituted waiver, leaving nothing to review on appeal. *United States v. Kelly*, No. 20150725, 2017 CCA LEXIS 453, at *9 (A. Ct. Crim. App. 5 Jul 2017). We agree. Like MIL. R. EVID. 304, R.C.M. 919(c)

---

[46] *See* MIL. R. EVID. 304(f)(1) ("Motions to suppress or objections under this rule, or MIL. R. EVID. 302 or 305, to any statement or derivative evidence that has been disclosed must be made by the defense prior to submission of plea. In the absence of such motion or objection, the defense may not raise the issue at a later time except as permitted by the military judge for good cause shown. *Failure to so move or object constitutes a waiver of the objection*.) (emphasis added).

[47] *See, e.g.,* RULE FOR COURTS-MARTIAL (R.C.M.) 920(f), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) (providing for "waiver" but only "in the absence of plain error"); *see also Payne*, 73 M.J. at 23, n.3 (applying a plain error analysis to R.C.M. 920(f), which states that the failure to object constitutes "'waiver of the objection in the absence of plain error'").

provides no provision for plain error review, and therefore, when a defense counsel fails to object to improper argument of government counsel, the defense waives the issue on appeal. We recognize that this conclusion differs from recent cases where CAAF has tested improper arguments for plain error. *See, e.g., Pabelona*, 76 M.J. at 11 ("Because defense counsel failed to object to the arguments at the time of trial, we review for plain error."). However, "[t]o the extent we are presented with contrary case law, we follow our superior court's most recent decision." *Kelly*, 2017 CCA LEXIS 453, at *9.

Here, applying *Ahern*, we find TC's comments, where preserved by objection, do not constitute prosecutorial misconduct.[48] Even assuming *arguendo* TC's actions amounted to prosecutorial misconduct, the errors did not materially prejudice a substantial right of the appellant and therefore do not warrant relief.

a. Introducing Navy training against military judge's instruction

"An accused is supposed to be tried . . . [on] the legally and logically relevant evidence presented." *United States v. Schroder*, 65 M.J. 49, 57 (C.A.A.F. 2007). Thus, "[t]he prosecutor should make only those arguments that are consistent with the trier's duty to decide the case *on the evidence*, and should not seek to divert the trier from that duty." ABA CRIMINAL JUSTICE STANDARDS FOR THE PROSECUTION FUNCTION 3-6.8(c) (4th ed. 2015) (emphasis added). As a result, a court of appeals may find prosecutorial misconduct where TC "repeatedly and persistently" violates the RULES FOR COURTS-MARTIAL and MILITARY RULES OF EVIDENCE contrary to instructions, sustained objections, or admonition from the military judge. *Hornback*, 73 M.J. at 160[49].

Here, the appellant contends the TC "ma[de] inaccurate references to law"[50] when he "told the members that they were allowed to use their [Navy sexual assault and bystander] training in determining the case"[51] contrary to

---

[48] *See, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974) (reversing the First Circuit's finding of prosecutorial misconduct because the "distinction between ordinary trial error of a prosecutor and that sort of egregious misconduct . . . should continue to be observed.").

[49] *See, e.g., United States v. Crutchfield*, 26 F.3d 1098, 1103 (11th Cir. 1994) (finding prosecutorial misconduct in repeated violation of Federal Rules of Evidence 404, 608, and 609, where such violations "continued even after the court instructed the prosecutor as to their impropriety").

[50] Appellant's Brief at 23.

[51] *Id.* at 26 (footnote omitted).

a preliminary instruction from the military judge to disregard such training.[52]

Throughout the course of the entire proceeding, the TC mentioned the Navy sexual assault and bystander training on three occasions—the first during cross examination of a character witness for the defense, Petty Officer First Class J.D.:

> Q: Now, OS2 Motsenbocker – did he receive any training regarding bystander awareness?
>
> A: Yes, we all have.
>
> Q: Can you summarize briefly what is that? What does that training entails (sic)?
>
> A: Bystander Intervention would be basically if you see something wrong happening. It's our duty to step in and stop it before it gets out of hand.
>
> Q: And that pertains specifically to sexual assaults, right?
>
> A: Yes.
>
> Q: When you see somebody drunk who's maybe in a compromised position we're supposed to protect them, right?
>
> A: Yes, sir.
>
> Q: We're not supposed to have sex with people in compromised positions, right?
>
> A: Yes, sir.[53]

Later, in closing argument, the TC argued that "[s]omething overcame his discipline, his self-control, *training* that he's undergone with the Navy" and stated that in addition to using common sense, the members were "allowed to use your *training*. . . . your knowledge and experience in determining this case."[54] However, immediately following this statement, the TC warned members that any sexual assault prevention and response (SAPR) training

---

[52] Record at 146. ("As members, in the naval service, we have all received extensive training during recent years on the issue of sexual assault in the military. During that training, we are provided definitions and policies regarding sexual assault. Any definitions, explanations or policies provided during that training must be completely disregarded by you in this criminal trial.").

[53] *Id*. at 671-72.

[54] *Id*. at 766; 768.

"is out the window" and to only apply the law as read and provided to them by the military judge.[55]

Concluding his closing argument, the TC arguably reintroduced bystander intervention training when he argued the appellant "was not looking out for a shipmate in need, at all."[56] He again emphasized the appellant's sexual desires "trumped all the *training* that everyone in the Navy gets about sexual assault" before asking the members to return a guilty verdict.[57]

The government avers the appellant waived this issue pursuant to *Ahern supra,* by failing to object prior to members' deliberations.[58] "Whether an appellant has waived an issue is a question of law reviewed de novo." *Ahern*, 76 M.J. at 197 (citation omitted). "The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case . . ." *United States v. Elespuru*, 73 M.J. 326, 328 (C.A.A.F. 2014) (citation and internal quotation marks omitted).

At trial, the civilian defense counsel objected to the line of questioning about training during cross-examination as argumentative and was overruled. He also objected after the entirety of TC's closing argument in a request for mistrial, on "the simple fact that the government stated that one drink and you can't consent" after repeatedly asserting that PO3 AD was drunk.[59] This request was similarly denied.[60] Neither objection specifically nor adequately preserved the issue of referencing Navy sexual assault

---

[55] *Id.* at 768 ("Now, the judge just read you the instructions, that is, the law. That is what sexual assault is. That is what abusive sexual contact is. I'm sure that you all have preconceived notions about what consent means, what sexual assault means, what abusive sexual contact means. We've all been through different SAPR Trainings. You've heard people saying things like, one drink and you can consent. *All that stuff is out the window*. That piece of paper that you, have in front of you those pages, that's the law that you need to apply, here, today.") (emphasis added).

[56] *Id.* at 794.

[57] *Id.* at 795 (emphasis added).

[58] Appellee's Brief of 25 May 2017 at 42.

[59] Record at 797.

[60] *Id.* at 798 ("[M]otion for mistrial is denied. The military judge's understanding . . . was that [TC] clarified the standard to which they are supposed to follow in accordance with Pease and the other more recent information regarding capacity to consent and defining a competent person who can consent.")

training.[61] Moreover, the civilian defense counsel *approved* a member's question squarely raising appellant's decision to disregard his training on sexual assault.[62] "It is thus apparent, under the particular facts of this case, that counsel consciously and intentionally failed to save the point . . . ." *Elespuru*, 73 M.J. at 329 (citation and internal quotation marks omitted). Accordingly, we find that appellant exceeded passive forfeiture and alternately waived this issue.[63]

b. Calling the appellant a liar

As a threshold matter, we hold that the appellant did not waive this issue by failing to object at trial. The appellant's civilian defense counsel specifically moved for a mistrial prior to the members' deliberations on the grounds that the TC made disparaging comments about the appellant and called him a liar.[64] Therefore, we review for prejudicial error. *Fletcher*, 62 M.J. at 179.

Our superior court has warned that "calling the accused a liar is a dangerous practice that should be avoided." *Fletcher*, 62 M.J. at 182 (citation and internal quotation marks omitted). This caution recognizes a prosecutor's goal "is not that it shall win a case, but that justice shall be done." *Berger*, 295 U.S. at 88. Ultimately, disparaging comments "have the potential to

---

[61] *See, e.g.*, *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) (only making the correct specific objection preserves issue for appeal).

[62] AE LV at 1 ("With all the GMT training you received on sexual assaults and bystander intervention training why did you decide to sleep on the bed vice going to the sofa in the common area[?]").

[63] Even conducting a plain error analysis for the benefit of the appellant, we conclude that appellant was not prejudiced by the discussion of Navy sexual assault and bystander training. Here, the appellant fails to demonstrate a "reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominquez Benitez*, 542 U.S. 74, 82 (2004) (citations and internal quotgation marks omitted). Although we do not condone a TC's use of Navy training during courts-martial, the military judge correctly issued the instruction for the members to disregard any training, and the TC reiterated that message during his closing argument in mitigation. Not only do we presume the members follow the instructions of the military judge, *United States v. Jenkins*, 54 M.J. 12, 20 (C.A.A.F. 2000), but the appellant's repeated failure to object also indicates "that either no error was perceived or any error committed was inconsequential." *United States v. Sittingbear*, 54 M.J. 737, 740 (N-M. Ct. Crim. App. 2001).

[64] *See* Record at 862; AE LXV.

mislead the members" and to "detrac[t] from the dignity and solemn purpose of the court-martial proceedings." *Fletcher*, 62 M.J. at 182.

However, describing a defendant as a liar does not equate to per se error.[65] Notably, TC is permitted to "'forcefully assert reasonable inferences from the evidence.'" *United States v. Coble*, No. 201600130, 2017 CCA LEXIS 113, at *10, unpublished op. (N-M. Ct. Crim. App. 23 Feb 2017) (quoting *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008)). Therefore, the "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir. 1987) (citing *United States v. Williams*, 529 F. Supp. 1085, 1106-07 (E.D.N.Y. 1981) ("'Lie' is an ugly word, but it is appropriate when it fairly describes the ugly conduct it denotes."). In other words, it is appropriate for TC to "comment on . . . conflicting testimony" unless using "language that [i]s more of a personal attack on the defendant than a commentary on the evidence." *Fletcher*, 62 M.J. at 183.

Nevertheless, it is an "exceedingly fine line which distinguishes permissible advocacy from proper excess." *Id.* at 182 (citation and internal quotation marks omitted). One factor in determining if the TC has crossed this line is whether the TC ties the comment to evidence in the record. Where the TC has "explained why the jury should come to th[e] conclusion" that the appellant lacks credibility, the Court may find permissible advocacy. *Cristini*, 526 F.3d at 902. However, where the TC's statements are "unsupported by any rational justification other than an assumption that [the appellant] was guilty," and "not coupled with a more detailed analysis of the evidence adduced at trial[,]" the comments turn improper. *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). These untethered assertions "convey an impression to the jury that they should simply trust the [government's] judgment" that the accused is guilty because the TC "knows something [the jury] do[es] not." *Id.*

Despite the appellant's claim, the TC never called the appellant a "liar" at trial.[66] Likewise, the TC never referred to the appellant and an act of lying during his initial closing argument. However, the TC did use the words "lies" and "lying" with reference to the appellant approximately 15 times during his

---

[65] *See, e.g.*, *Fletcher*, 62 M.J. at 182-83 (finding TC's comments that Fletcher's testimony "was the first lie," that he "had 'zero credibility' and that his testimony was 'utterly unbelievable'" were "not so obviously improper as to merit relief in the absence of an objection from counsel").

[66] Appellant's Brief at 29-30.

rebuttal argument.[67] All but one of these instances were connected to discrepancies between appellant's original statement to NCIS and his testimony at trial. First, the TC argued appellant expanded the time frame for the events that night to downplay PO3 AD's vomiting:

> You will notice that when OS2 Motsenbocker took the stand and told you a completely different story than he told NCIS and, ultimately, you might have gotten whiplash watching that story go back and forth; [']oh, no, it was before the police. Okay, I guess I did tell the NCIS, so I guess it did happen after the police got there[']. . . Why is he . . . elongating the night? . . . The reason why he's lying to you that way is because he wants to minimize the vomiting. [68]
>
> . . . .
>
> You heard him, "Oh, I laid her down and then I went and cleared everybody out. It took me an hour to clean up the house.["] Right? That's what he said. And then, when I presented him with text messages at 1227, so I may have been mistaken. He was mistaken. He was misleading. He was lying, and he's trying to get away with it.[69]

Second, the TC argued the appellant and defense mischaracterized statements made by police concerning whether PO3 AD was able to leave the appellant's house that night:

> [A]nother lie that he says [is] so obvious. This is what [the appellant] said in his original NCIS statement, "They could tell that she had been throw[ing] up and everything. So, they told me that she shouldn't leave, because at least not right away, because she's not in the condition to leave." That's his statement . . . and, for some reason, even defense counsel in their argument, keeps inserting "shouldn't leave" to "shouldn't drive." Listen to that statement very carefully. You would never hear [the appellant] ever say that to NCIS in October 2014.[70]

---

[67] Record at 824-56.

[68] *Id*. at 828-30.

[69] *Id*. at 835.

[70] *Id*. at 832.

Finally, the TC argued the appellant added information during his testimony that PO3 AD was responding sexually to the appellant's conduct, which was not previously disclosed to NCIS:

> [T]he NCIS statement is a believable account. We would agree with that. Too bad it's drastically, different from the one he had on the stand. So, here's what he gives you now. That new timeline we talked about . . . . What's the new information he provides us? "The moaning. The moisture. She's sexually turned on. She's spreading her legs. I gave oral sex to her. But, when I looked up, she was on the phone.". . . He changed his story, over and over again . . . He's lying. And he's lying because he committed a crime.[71]

We conclude, therefore, that the TC's arguments do not constitute error because he "avoided characterizing [the appellant] as a liar" and grounded all but one of his "comments instead to the plausibility of [the appellant's] story[.]" *Fletcher*, 62 M.J. at 183. This conclusion is supported by the fact that the TC only made such comments during rebuttal after the defense's closing argument, where the civilian defense counsel had asserted the appellant "went in [to NCIS] to be an open book, just like he was here with you"[72] and that "he volunteered the information; the entire story."[73] Here, just as in *Fletcher*, "the defense opened the door and it was appropriate for trial counsel to comment on [the appellant's] conflicting testimony during h[is] findings argument." 62 M.J. at 183.

c. Improper bolstering of the victim's testimony

It is well-established that it is the "exclusive province of the court members to determine the credibility of witnesses." *United States v. Knapp*, 73 M.J. 33, 34 (C.A.A.F. 2014) (citation and internal quotation marks omitted). To protect the integrity of this province, the "TC should not imply special or secret knowledge of the truth or of witness credibility, because when the prosecutor conveys to the jurors his personal view that a witness spoke the truth, it may be difficult for them to ignore that witness' views." *United States v. Andrews*, No. 201600208, 2017 CCA LEXIS 283, at *23, unpublished op. (N-M. Ct. Crim. App. 27 Apr 2017) (citations and internal quotation marks omitted). Thus, "improper vouching occurs when the trial counsel places the prestige of the government behind a witness through

---

[71] *Id.* at 844-45.

[72] *Id.* at 801.

[73] *Id.* at 811.

personal assurances of the witness's veracity." *Fletcher*, 62 M.J. at 179 (citation and internal quotation marks omitted). Such assurances may be evidenced by "the use of personal pronouns in connection with assertions that a witness was correct or to be believed" such as "I think it is clear," "I'm telling you," and "I have no doubt." *Id.* (citations and internal quotation marks omitted).

However, not all forms of vouching are improper. Closing arguments and rebuttal "may properly include reasonable comment on the evidence in the case, including references to be drawn therefrom, in support of a party's theory of the case." R.C.M. 919(b) (2016 ed.). Specifically, the TC may "comment about the testimony, conduct, motives, interests, and biases of witnesses to the extent supported by evidence." R.C.M. 919(b), Discussion. "Thus, it is not improper vouching for TC to argue, while marshalling evidence, that a witness testified truthfully, particularly after the defense vigorously attacks this witness' testimony . . . ." *Andrews*, 2017 CCA LEXIS 283, at *24 (citation and internal quotation marks omitted). To illustrate, such permissible language includes "you are free to conclude," "you may perceive that," "it is submitted that," or "a conclusion on your part may be drawn." *Fletcher*, 62 M.J. at 180 (citation and internal quotation marks omitted).

During rebuttal,[74] the TC acknowledged that the civilian defense counsel had "honed in on two inconsistencies" in PO3 AD's testimony during his closing argument, declaring the fact that the cops left her at the appellant's house to be "a hole in [the government's] case." TC responded:

> The fact that she's using a different adjective for being pressed
> up against her, than she did her original statement, doesn't
> make her statement unreliable or different. . . . [PO3 AD has]

---

[74] The appellant also alleges improper vouching during the TC's closing argument when he analogized PO3 AD "would have to be a diabolical super-genius; Lex Luther-level, Machiavellian" to have made up the charges. Record at 784. This is an issue of mischaracterizing the evidence, rather than improper vouching. *See Fletcher*, 62 M.J. at 183-84 (finding error where the TC referred to Jesse Jackson, Jerry Falwell, Jim Bakker, Dennis Quaid, Matthew Perry and Robert Downey Jr. because the references "improperly invited comparison to other cases, the facts of which were not admitted into evidence and which bore no similarity" to the case at bar). Here, the TC's analogy, although not condoned, did not invite comparison to other cases, and therefore does not constitute severe misconduct. *See, e.g.*, *United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007) (declining to find severity where "trial counsel's comparison of [a]ppellant to Hitler, bin Laden, and Hussein . . . were made in the context of a permissible theme").

told the truth so many times. She's told it to [PO3 ZA], as it is happening to her. She told it to [PO3 ZA] the next morning; [TR] the next morning. She told her command the next business day. She told it to [MO]. She's been interviewed by NCIS, multiple times. She's testified in this court. And the best that they can come up with, defense, they are presenting to you as evidence that she is not a truthful person. Is that she uses the word pinned down? That's a hole in the government's case? That's strength. [PO3 AD's] consistency and the immediacy of her report is a strength, not a hole.[75]

The TC later commented, "she has been unbelievably consistent" and told the members that "you can convict him on the strength of her testimony alone."[76] Although the civilian defense counsel did not contemporaneously object to these comments, the defense's motion for appropriate relief and motion for mistrial complained that the TC had put the weight of the government behind their witness.[77]

Mindful that prosecutorial comments must be analyzed in the context of the full record, the TC's comments in this case were made following the civilian defense counsel's lengthy closing argument in which he repeatedly attacked PO3 AD's credibility, even focusing on the theme of "[r]egret after the fact."[78] It was the civilian defense counsel who first argued "[her] story makes no sense" and "[i]t's not believable."[79] He continued this attack, later stating again that "[i]t doesn't make any sense. It's not believable. Nothing in her story is believable."[80] In all, the civilian defense counsel called PO3 AD's story "not believable" nine times, said it "makes no sense" sixteen times, and claimed [PO3 AD] "wants you to believe" six times during the defense's closing argument.[81] As the Supreme Court has said, "it is important that both the defendant and prosecutor have the opportunity to meet fairly the evidence and arguments of one another." *United States v. Robinson*, 485 U.S. 25, 33 (1988). Here, the TC forcefully argued PO3 AD's consistency during rebuttal to meet the civilian defense counsel's attack on her credibility during

---

[75] Record at 826.

[76] *Id.* at 840-41.

[77] AE LXV at 4.

[78] Record at 800.

[79] *Id.* at 810, 811.

[80] *Id.* at 818.

[81] *Id.* at 800-821.

the defense closing argument. Markedly, the appellant alleges error in statements identical to statements first made by his own counsel, substituting the subject person. We follow our superior court's principle that an "'[a]ppellant cannot create error and then take advantage of a situation of his own making.'" *United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999) (quoting *United States v. Raya*, 45 M.J. 251, 254 (C.A.A.F. 1996)).

d. Mischaracterizing evidence

A prosecutor "may strike hard blows" against a defendant, but is "not at liberty to strike foul ones." *Berger*, 295 U.S. at 84, 88 (finding prosecutorial misconduct in part because the prosecutor "misstat[ed] the facts in his cross-examination of witnesses" by "putting into the mouths of such witnesses things which they had not said," and "assuming prejudicial facts not in evidence"). Indeed, "[i]t is a fundamental tenet of the law that attorney[s] may not make material misstatements of fact in summation."[82] *Davis v. Zant*, 36 F.3d 1538, 1548 n.15 (11th Cir. 1994) (citation omitted). "At the same time, counsel are prohibited from making arguments calculated to inflame the passions or prejudices of the jury." *Fletcher*, 62 M.J. at 183.

The appellant maintains the TC invented statements that did not exist "for the purpose of inflaming the passions of the jury" during his rebuttal when the TC provided commentary on why the police left PO3 AD at the appellant's house.[83] Specifically, the TC argued:

> The defense spent a lot of time talking about this idea that the police just left her there, as if that was stupid and crazy. You know why they left her there? Because she had a good-looking, strapping, young Petty Officer who was taking care of her. 'I got this. I'm getting her water. I'm giving her bread. It's cool cops, I got this.' That's why they left her there.[84]

The civilian defense counsel objected on the basis of mischaracterizing the evidence. The military judge overruled the objection, explaining that she "did not hear trial counsel attribute that statement to the accused."[85]

---

[82] *See also* ABA, at 3-6.8(a) ("The prosecutor should not knowingly misstate the evidence in the record, or argue inferences that the prosecutor knows have no good-faith support in the record.").

[83] Appellant's Brief at 33.

[84] Record at 832-33.

[85] *Id*. at 833.

Here, we heed the Supreme Court's caution that "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). As the military judge determined and the record confirms, the TC never attributed the statements to the appellant, nor claimed to be quoting portions of the appellant's testimony. In context, the more likely and less damaging interpretation is that the TC intended to rebut the "[a]ppellant's contention that if [PO3 AD] was highly intoxicated, the police would not have left her in [the a]ppellant's care[,]" by offering another hypothetical explanation.[86] We refuse to infer otherwise, especially where to do so would contradict a military judge's firsthand observation and analysis at trial.[87] Regardless, we find that the statement did not prejudice the appellant.

e. Inserting trial counsel's opinion

In his motion for mistrial, the appellant argued that the TC interjected his personal beliefs and opinions, thereby materially prejudicing the appellant.[88] On appeal, the appellant argues that the TC undeniably "inserted [himself] into the proceedings by using the pronouns 'I' and 'we'." *Fletcher*, 62. M.J. at 181. All but one of the complained of uses occurred during his rebuttal argument, where the TC flatly stated, "If you disagree with me, that's fine."[89] He also argued:

> Defense said this over and over again. She didn't take responsibility for her actions. *I don't know*. Maybe she didn't. I don't know. And frankly *I don't care* and neither should you. And the reason is she's not on trial.[90]

The Supreme Court has long-recognized that a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to

---

[86] Appellee's Brief at 40 (TC "was arguing that it was reasonable to infer that the police left because it appeared to them that [a]ppellant was assisting" PO3 AD.).

[87] *See United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014) ("While not required, where the military judge places on the record [her] analysis and application of the law to the facts, deference is clearly warranted.") (citation and internal quotation marks omitted).

[88] AE LXV at 4.

[89] Record at 848.

[90] *Id*. at 853 (emphasis added).

govern at all[.]" *Berger*, 295 U.S. at 88. Certainly, it is a "breach [of] their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence." *Young*, 470 U.S. at 7. Thus, improper interjection of a prosecutor's views constitutes prosecutorial misconduct because "it may confuse the jurors and lead them to believe that the issue is whether or not the prosecutor is truthful instead of whether the evidence is to be believed." *Fletcher*, 62 M.J. at 181 (citation omitted).

However, improper interjection is not found by merely counting the number of pronouns, but rather must be examined for possible effect on the jurors.[91] Many of the TC's comments in the case at bar actually focused on possible theories *for* the defense. For example, the TC said, "I'll certainly admit the first blush, the text message thing, is a little weird . . . ."[92] Later, he stated, "I guess, and I'm only guessing, trying to connect the dots, here; cover up a notorious kissing, of [PO3 PC] by, falsely, accusing [the appellant,] I think that's what they're saying."[93] Many others simply did not offer an opinion on the "truth or falsity of any testimony or evidence." *United States v. Horn*, 9 M.J. 429, 430 (C.M.A. 1980) (finding improper argument where TC used the phrase "I think" when specifically "analyzing the evidence of record . . . and in suggesting what weight ought to be given by the court to various evidence"). Rather, the TC in this case often said, "I don't know what that means"[94] and "I guess."[95] Therefore, we do not find the TC's statements, taken in context, to be "a form of unsworn, unchecked testimony," *id.*, resulting in any prejudice to the appellant.

f. Comments on the defense and shifting the burden of proof

Mirroring the TC's duty to refrain from inserting personal opinions, "it is also improper for a [TC] to attempt to win favor with the members by maligning defense counsel." *Fletcher*, 62 M.J. at 181 (citation omitted). Thus, this court may declare prosecutorial misconduct where "one attorney makes personal attacks on another," creating "the potential for a trial to turn into a popularity contest." *Id.* In addition to "detract[ing] from the dignity of judicial

---

[91] *See Baer*, 53 M.J. at 238 (C.A.A.F. 2000) ("The focus of our inquiry should not be on words in isolation, but on the argument as 'viewed in context.'") (quoting *Young*, 470 U.S. at 16).

[92] Record at 784.

[93] *Id.* at 848.

[94] *Id.* at 838.

[95] *Id.* at 851.

proceedings[,]" personal attacks can "cause the jury to believe that the defense's characterization of the evidence should not be trusted, and, therefore, that a finding of not guilty would be in conflict with the true facts of the case." *United States v. Xiong*, 262 F.3d 672, 675 (7th Cir. 2001). This squarely violates the core legal standard of criminal proceedings, that the government always bears the burden of proof to produce evidence on every element and persuade the members of guilt beyond a reasonable doubt. *United States v. Czekala*, 42 M.J. 168, 170 (C.A.A.F. 1995); R.C.M. 920(e)(5)(D).[96]

Here, the appellant asserts that the TC "crossed the line when attacking the defense's case."[97] Explicitly, the appellant alleges error in the TC's comments about the "defense's fanciful imagination world[,]"[98] the "[s]exual assault myths that defense, cravenly, runs full steam into"[99] and that the defense was "[g]rasping at straws."[100] Implicitly, the appellant maintains that the TC "insinuated that the defense had worked with their client in order to lie on the stand."[101] After discussing other discrepancies between the appellant's statements to NCIS and his testimony, the TC said:

> That's what he presents to NCIS. Now, obviously, that story is not going to work for defense. So, he's got to take the stand and give you something else, something more, something different.[102]

Using these statements as a premise, the appellant contends that the TC ultimately shifted the burden to the defense when he said, "So, if you're discussing this or you're entertaining the idea that he's not guilty that . . . we haven't met the burden because the defense's theory seems to be so persuasive."[103]

---

[96] *See also United States v. Crosser*, No. 35590, 2005 CCA LEXIS 412, at *13, unpublished op. (A.F. Ct. Crim. App. 23 Dec 2005) ("[T]he burden of proof never shifts to the defense.").

[97] Appellant's Brief at 37.

[98] Record at 838.

[99] *Id*. at 841

[100] *Id*. at 842.

[101] Appellant's Brief at 38.

[102] Record at 843-44.

[103] *Id*. at 848.

We disagree. Not only do these statements merely, and permissibly, address a theory of reasonable doubt offered by the defense by arguing the implausibility of the appellant's version of the facts, but the TC had already explicitly reminded the members that the defense did not have the burden:

> Defense doesn't have to put on a case. They don't have to cross-examine anybody. But, when they come in front of you and present you a theory, you can kick the tires on it.[104]

We conclude the TC's comments about the defense did not shift the burden of proof nor rise to the level of prosecutorial misconduct. For a TC to shift the burden to an accused is "an error of constitutional dimension" accompanied by a high threshold that is not met by the ambiguous statements here. *United States v. Mason*, 59 M.J. 416, 424 (C.A.A.F. 2004).

To summarize our assessment of error, we do not find legal error in the TC's closing or rebuttal arguments where, as here, the TC zealously responded to the defense's theory of the case and assertions made during the defense's closing argument. "While a criminal trial is a serious effort to ascertain truth and an atmosphere of passion or prejudice should never displace evidence it is also a practical matter which can hardly be kept free of every human error." *United States v. Stockdale*, 13 C.M.R. 540, 543 (N.B.R. 1953). Here, it cannot be said that the TC's "argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury." *Berger*, 295 U.S. at 85. Rather, the TC's "remarks were invited, and did no more than respond substantially in order to right the scale." *Young*, 470 U.S. at 12-13) (internal quotation marks omitted).

### 2. Prejudice to the appellant

While we find that the TC did not commit prosecutorial misconduct in either his argument or rebuttal, we conclude that even if we were to find error rising to the level of prosecutorial misconduct, there was no prejudice. In so concluding, we recognize that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone[.]" *Young*, 470 U.S. at 11. Accordingly, "relief will be granted if the trial counsel's misconduct actually impacted on a substantial right of the accused (i.e., resulted in prejudice)." *Fletcher*, 62 M.J. at 184 (citation and internal quotation marks omitted). When analyzing the record for prejudice, the court must assess whether the misconduct is "not slight or confined to a single instance, but . . . pronounced and persistent, with a probably cumulative

---

[104] *Id*. at 840.

effect upon the jury which cannot be regarded as inconsequential." *Id.* at 185. Reversal is necessary "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone. *Id.* at 184.

The Court employs a three factor balancing test to evaluate prejudicial impact on a verdict: (1) the severity of the misconduct, (2) any curative measures taken, and (3) the strength of the Government's case. *Id.* We discuss each factor in turn.

a. Severity of misconduct

> Indicators of severity include (1) the raw numbers—the instances of misconduct as compared to the overall length of the argument, (2) whether the misconduct was confined to the trial counsel's rebuttal or spread throughout the findings argument or the case as a whole; (3) the length of the trial; (4) the length of the panel's deliberations; and (5) whether the trial counsel abided by any rulings from the military judge.

*Fletcher*, 62 M.J. at 184 (citation omitted). In this case, even assuming as true the appellant's allegations of improper argument, we agree with the military judge's finding during trial that the severity of any misconduct was low.[105] First, the actual raw instances of alleged misconduct were minimal.[106] To illustrate, the TC referred to appellant's "lie(s)" or "lying" only approximately 15 times within the 32-page rebuttal. *Contra Andrews*, 2017 CCA LEXIS 283, at *14 (finding error where TC argued the lies of the appellant "some 25 times in total" within just 11 pages). Second, the alleged errors were almost entirely confined to that 32-page rebuttal, out of an 889-page record, and thus did not permeate the case as a whole. Third, the appellant's trial lasted five days with just one of those days encompassing the errors alleged now. Although the fourth factor weighs in favor of the appellant, as the members only deliberated for approximately one hour and fifteen minutes, it is not enough to overcome the first three factors in favor of the government. The fifth factor is neutral, as the military judge did not make a ruling for the TC to abide by before he completed rebuttal; the

---

[105] *Id.* at 866. "So I'll note as towards the severity of the misconduct – I think that severity was low, and that it was in rebuttal argument."

[106] The appellant cited several of the TC's statements in more than one variation of prosecutorial misconduct. For example, the appellant asserted the TC's statement, "I don't know what defense's argument is, and you can probably make more sense of it than I can" for both interjecting his personal opinion and commenting on the defense to shift the burden. Appellant's Brief at 36-7.

military judge denied the defense's request for a mistrial at the end of TC's closing argument[107] and overruled the objection for mischaracterizing the evidence.[108]

b. Curative measures taken

"Generally, potential harm from improper comments can be cured through a proper curative instruction." *United States v. Boyer*, No. 201100523, 2012 CCA LEXIS 906, at *33, unpublished op. (N-M. Ct. Crim. App. 27 Dec 2012) (citation omitted). However, the extent of curative effect depends on how specifically the instruction targets the misconduct. Indeed, our superior court has repeatedly emphasized "[c]orrective instructions at an early point might have dispelled the taint of the initial remarks." *Fletcher*, 62 M.J. at 185 (citation and internal quotation marks omitted). As a result, we would find a curative instruction insufficient where "[i]t is impossible to say that the evil influence upon the [members] of these acts of misconduct was removed by such mild judicial action as was taken." *Berger*, 295 U.S. at 85.

Here, the military judge did not take any specific curative measures in response to the TC's rebuttal argument while delivered. In the military judge's own analysis of this factor on the record, she explained the comments were not "significant enough to cause the military judge to stop the argument or to excuse the members while it was happening in real-time."[109] We agree with the government that "[t]o the extent that she did not issue repeated curative instructions contemporaneously with the alleged error . . . this was [largely] the result of [the a]ppellant's failure to timely object." (citation omitted)[110]

However, the military judge did procure an overnight recess and reread instructions the following morning before deliberations.[111] Moreover, the military judge had issued a curative instruction before any closing arguments began:

> You will hear an exposition of the facts by counsel for both sides as they view them. Bear in mind that the arguments of counsel are not evidence. Argument is made by counsel to assist you in understanding and evaluating the evidence, but

---

[107] Record at 796-98.

[108] *Id*. at 832-33.

[109] *Id*. at 866.

[110] Appellee's Brief at 49.

[111] Record at 860; 871-73.

> you must base the determination of the issues in the case on the evidence as you remember it and apply the law as I instruct you.[112]

The military judge also reiterated minutes before deliberations that "[a]gain, argument by counsel is not evidence; counsel are not witnesses" and should "the facts as you remember them differ from the way counsel stated the fact [then] it is your memory that controls."[113] Conclusively, "the members are presumed to follow the military judge's instructions." *United States v. Holt*, 33 M.J. 400, 408 (C.M.A. 1991). We do not find evidence to the contrary. *Id.*

c. Strength of the government's case

Our superior court has found this third factor, the weight of the evidence supporting conviction, may be "strong enough to establish lack of prejudice in and of itself." *Pabelona*, 76 M.J. at 12. Relative to the defense case, the government's case here was strong. As we noted *supra,* PO3 AD and appellant had never met before the night in question and, except for a brief introduction, did not speak to each other until the assault. The members viewed and listened to the appellant's interview with NCIS, observed his real-time testimony under oath, and even questioned him. The members were thus given an opportunity to fully weigh the appellant's credibility against PO3 AD's testimony. The government also presented corroborating text messages sent during the sexual assault which flatly stated "[r]ape" and "help[.]"[114] Collectively, the strength of this evidence firmly supports the appellant's convictions.

With all three factors resolved in favor of the government, we conclude any misconduct by the TC did not materially prejudice the accused and we are thus "confident that the members convicted the appellant" beyond a reasonable doubt of the two specifications of abusive sexual contact and one specification of sexual assault "on the basis of the evidence alone." *Fletcher*, 62 M.J. at 180.

### III. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed.

---

[112] *Id.* at 752-53.

[113] *Id.* at 876-77.

[114] PE 3 at 2-3.

FULTON, Judge (concurring in the result):

I agree with Parts I, IIB and III of the lead opinion and that the findings and sentence should be affirmed. I write separately because I think that as to Part IIA both the lead opinion and the dissent make this case harder than it needs to be.

The appellant was charged with committing a sexual act upon another person by causing bodily harm to that other person. The government presented ample evidence to support a conviction. The military judge properly instructed the members that the government had to prove that the appellant committed the bodily harm without the consent of the other person. This instruction defined consent as a freely given agreement to the conduct at issue by a competent person. None of these instructions are controversial.

At trial, the parties disputed the victim's competence—a necessary precondition to consent. The military judge elaborated on the subject of consent by telling the members that a person is incapable of consenting if that person does not possess the mental ability to appreciate the nature of the conduct or does not possess the physical or mental ability to make or communicate a decision regarding such conduct. The appellant did not object to this instruction, and it does not represent, as the appellant now claims, an importation of a new theory of liability into the case.

The appellant was already on notice the government would have to prove lack of consent, and that consent means a freely given agreement to the conduct at issue by a competent person. The word *competent* is not defined by statute. But was the appellant prejudiced when the military judge instructed members that people without the mental ability to appreciate the nature of the conduct and people without the physical or mental ability to make or communicate a decision regarding such conduct cannot consent? Surely no one so described could be considered competent to give consent. I am therefore convinced that the assignments of error addressed in Part IIA of the lead opinion are withot merit and that following the military judge's instructions could have only led members to convict the appellant of the offenses properly before the court-martial.

CAMPBELL, Senior Judge (dissenting):

Based on my reading of *United States v. Riggins*, 75 M.J. 78 (C.A.A.F. 2016) and *United States v. Sager*, 76 M.J. 158 (C.A.A.F. 2017), affirming the appellant's convictions in this case does not give the requisite legal effect to both Articles 120(b)(1)(B) and 120(b)(3), Uniform Code of Military Justice (UCMJ), as separate criminal theories of liability. Therefore, I respectfully dissent.

Reversing our opinion in *Riggins*, the Court of Appeals for the Armed Forces (CAAF) explains, "the fact that the Government was required to prove a set of facts that resulted in [the victim's] *legal inability to consent* was not the equivalent of the Government bearing the affirmative responsibility to prove that [the victim] *did not, in fact, consent*." 75 M.J. at 84. (emphasis in original). The CAAF draws a clear distinction between factual consent and a legal inability to consent, and specifically notes that this court had *erroneously* held "that the Government could not prove sexual assault or abusive sexual contact 'by threatening or placing that other person in fear without necessarily proving assault consummated by a battery, because *one cannot prove a legal inability to consent without necessarily proving a lack of consent*." *Id.* at 82 (quoting United States v. *Riggins*, No. 201400046, 2014 CCA LEXIS 864, at *14 (N-M. Ct. Crim. App. 26 Nov 2014) (emphasis added).

In *Sager*, another more recent opinion reversing this court, the CAAF held that "asleep, unconscious, or otherwise unaware" creates three separate criminal liability theories under Article 120(b)(2)—noting the words "'asleep, unconscious, or otherwise unaware,' are separated by the disjunctive, 'or.'" 76 M.J. at 161. The court held, "Under the 'ordinary meaning' canon of construction, therefore, 'asleep,' 'unconscious,' or 'otherwise unaware' as set forth in Article 120(b)(2) reflect separate theories of liability." *Id.* at 162 (citation omitted). Applying another canon of construction, the CAAF further held that "to accept the view that the words 'asleep, unconscious, or otherwise unaware,' create only one theory of criminality would be to find that the words 'asleep,' 'unconscious,' and 'or' are mere surplusage. This we are unwilling to do." *Id.* (citation omitted)

Examining Article 120(b) in the context of *Sager*'s statutory interpretation of its component Article 120(b)(2) offenses, Article 120(b) on the whole more broadly codified separate and distinct theories of criminal liability by proscribing sexual acts upon another person under any of the four subparagraphs of subsection (b)(1), when the perpetrator knows or reasonably should know that the victim falls into one of the categories in subsection (b)(2), *or* when the perpetrator knows or reasonably should know that the victim is incapable of consenting due to any of the conditions in the two subparagraphs of subsection (b)(3).

Consequently, giving effect to all of the legal inability to consent theories of criminal liability as separate offenses and ensuring that none of the Article 120(b) provisions are rendered mere surplusage by our interpretation of the

statute requires us to limit application of Article 120(b)(1)(B) to allegations in which *only factual consent* is at issue.[1]

Factual consent is a "freely given agreement to the conduct" alleged under Article 120(b)(1)(B); there is no factual consent if there is "an expression of lack of consent through words or conduct[.]" Article 120(g)(8)(A).

*Legal consent* requires that a person have the competence to freely agree to the specific nature of the sexual conduct. Legal consent is at issue in alleged violations of Article 120(b)(1)(A), 120(b)(1)(C), 120(b)(1)(D), 120(b)(2), or 120(b)(3).

The lead opinion, in accordance with the distinctions drawn by the CAAF in *Riggins*, recognizes that both victims with the legal ability to consent and those having a legal inability to consent may express that they do not factually consent through their words or conduct. *See Riggins*, 75 M.J. at 84 n.6.

The government alleged only that the appellant engaged in sexual contacts and a sexual act with PO3 AD by bodily harm—in violation of only Article 120(b)(1)(B). Therefore, the government's theory that PO3 AD did not, in fact, consent to the sexual behavior, and the appellant's theory that she did, in fact, consent to the sexual behavior (or that there was at least a mistake of fact that she did, in fact, consent to the sexual behavior based on her physical responses to his gradual advances and escalating actions) was

---

[1] Alternatively, we may properly view Article 120(b)(1)(B) as applicable to situations in which competence is presumed, and thus not at issue, as the appellant suggests. Either approach recognizes that how the statutory element "without consent" relates to the existence of various theories of liability for Article 120, UCMJ, offenses is different than a decade ago. Before 1 October 2007, rape was simply "an act of sexual intercourse, by force and without consent," and the MANUAL FOR COURTS-MARTIAL—not the UCMJ—provided different theories of rape liability by explaining, in part, that consent could not be inferred "if resistance would have been futile" or was "overcome by threats of death or great bodily harm, or where the victim [was] unable to resist because of the lack of mental or physical faculties." MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2005 ed.), Part IV, ¶ 45.c.(1)(b). Regardless of which theory was presented at trial, the Article 120 statutory elements were the same, and there was but one sample "rape" specification. MCM, ¶ 45.f.(1). But if the theory of liability *now codified* at Article 120(b)(3)(A) is implicated whenever an Article 120(b)(1)(B) offense is alleged, Article 120(b)(1)(B) is relegated to no more than a definitional status. Giving each Article 120(b) provision its proper status requires the "competent person" part of the statutory definition of consent to be applied to all of the sexual assault theories *except* for Article 120(b)(1)(B)—and the "freely given agreement to the conduct" part of the definition to be applied to just Article 120(b)(1)(B).

the only theory of liability at issue. During the government's initial closing arguments, the trial counsel specifically explained the only theory of criminal liability at issue:

> We're not saying she was passed out or that she's blacked out something like that. She just didn't want him to do this, and she said no. And that's a crime. There's a lot of different types of sexual assault, and that's the sexual assault that we're here today to talk about.[2]

The factfinder could properly consider all of the surrounding circumstances to determine whether PO3 AD, in fact, consented to the sexual behavior through her words or conduct with the appellant—including evidence of her recently vomiting, not having brushed her teeth, not having removed a feminine hygiene product, not engaging in verbal dialogue with the appellant, continuing to text on her phone during at least parts of the encounter, etc.

However, the military judge instructed on much more than the factual consent theory at issue in this case. In fact, most of the Article 120(b) theories of criminal liability were included in the instructions given before closing arguments and again the following day immediately before the members deliberated on findings:

> All the surrounding circumstances are to be considered in determining whether a person gave consent [Article 120(b)(1)(B)] or whether a person did not resist or ceased to resist only because of another person's actions. An incompetent person cannot consent to a sexual contact, and a person cannot consent to a sexual contact while under threat or in fear [Article 120(b)(1)(A)].
>
> A person is incapable of consenting [Article 120(b)(3)] if that person does not possess the mental ability to appreciate the nature of the conduct or does not possess the physical or mental ability to make or communicate a decision regarding such conduct. . . .
>
> In deciding whether a person was incapable of consenting, many factors should be considered and weighted, including . . . awareness of the identity of the person with whom they are engaging in the conduct [Article 120(b)(1)(D)], level of consciousness [Article 120(b)(2)], amount of alcohol ingested,

---

[2] Record at 790.

tolerance to the ingestion of alcohol [Article 120(b)(3)(A)], and/or their ability to walk, talk and engage in other purposeful physical movements [Article 120(b)(3)(B)].[3]

And in addition to arguing the legal theory actually at issue, lack of factual consent, the trial counsel also argued one of the legal inability to consent legal theories included in the military judge's instructions. Specifically, the trial counsel argued that even if PO3 AD provided her factual consent through her words or conduct in the bedroom with the appellant, the members should still convict the appellant of the alleged offenses under Article 120(b)(1)(B) only because, under those circumstances, PO3 AD had a legal inability to consent under Article 120(b)(3):

> *Not only did she not consent*. She could not consent. And the definition here is a person is incapable of consenting if that person does not possess the physical ability to make or communicate a decision regarding sexual conduct. So this is just a, potential, threat for defense's theory. So maybe she's not, actually, telling him no. And she's not, actually, telling him no, and maybe her words aren't coming out. But, they are certainly coming via text message. Then maybe there's a reasonable mistake of fact as to consent, but here's the thing, even if you believe the lies coming out of his mouth. Even if you believe every word of that and you believe that [PO3 AD], after drinking shot for shot which left a heavy, 200 pound Petty Officer [C] lying back down on the floor with his ID on his chest; and she's drinking shot for shot, and she's doing all of these things, she's vomiting in the toilet, vomiting in the bed, police observe her and say that she can't even leave; [if] you think that that person, in that state is then saying to Petty Officer Motsenbocker, "Hey, do it to me, big daddy." And then he does it to her. That's still a crime in that fact pattern and that kind of world defense may, or may not, be trying to present to you. Even if she's saying, I wanted to have sex----[4]

The government's slide presentation also substantively outlined both theories as the trial counsel argued them. Nine slides' titles included the words "Did Not Consent," and the seven slides that followed were titled "AD COULD Not Consent."[115] This portion of the trial counsel's rebuttal argument

---

[3] *Id*. at 756-57; 871-72.

[4] *Id*. at 853-54 (emphasis added).

[5] Appellate Exhibit LXIV, at 3-6; Record at 835-855.

was apparently inconsistent with how both the civilian defense counsel and the military judge viewed the capable or incapable of consenting portion of the findings instructions. The civilian defense counsel interrupted:

> Objection, Your Honor: He's again misstating the law. He is not stating correctly from the instructions as far as from the . . . as far as incapable versus her consent. We request a correcting instruction to the jury of what the law actually is.[6]

The military judge immediately sustained the objection without further discussion, but the only curative measure was repeating the same instructions from which the trial counsel argued factual lack of consent did not matter because PO3 AD was legally incapable of consenting.[5] And despite the motion for a mistrial, even if the appellant waived the improper argument related to bystander intervention training issue as the lead opinion suggests, the first members' question asked during the appellant's testimony in his own defense demonstrates the members may have been receptive to, if not focused on, a theory of liability requiring no lack of factual consent to convict. Under these circumstances, I am unable to conclude that the instructions and arguments regarding a theory of liability not at issue, based upon the way the government charged the appellant, did not impact the findings. I would set aside the findings and authorize a rehearing.

For the Court



R. H. TROIDL
Clerk of Court

---

[6] The next morning, the military judge informed the parties that she intended,

> to reread the three paragraphs under consent regarding lack of consent and incapable of consenting, and our language in accordance with *Pease*, to follow that with a reiteration of a majority of the mistake of fact portion, and . . . a reminder of the normal instruction that if there's any deviation between instructions I gave and what counsel for either side had said that they are to accept my statement as correct, and to remind them that argument from counsel is not evidence.

*Id*. at 868.